[ORAL ARGUMENT NOT YET SCHEDULED]
No. 12-7111

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

TRITA PARSI and NATIONAL IRANIAN AMERICAN COUNCIL,

Appellants,

v.

DAIOLESLAM SEID HASSAN,

Appellee.

---

Appeal from Orders Entered by the United States District Court for the
District of Columbia (Case No. 1:08-cv-00705) (The Hon. John D. Bates,
Presiding)

---

BRIEF OF APPELLEE DAIOLESLAM SEID HASSAN

---

| | |
|---|---|
| HL Rogers | Timothy E. Kapshandy |
| Peter G. Jensen | Sidley Austin LLP |
| Thomas E. Ross | One South Dearborn |
| Paul J. Sampson | Chicago, Illinois 60603 |
| Sidley Austin LLP | t. (312) 853-7000 |
| 1501 K Street, N.W. | f. (312) 853-7036 |
| Washington, D.C. 20005 | tkapshandy@sidley.com |
| t. (202) 736-8000 | |
| f. (202) 736-8711 | *Counsel for Appellee* |
| hrogers@sidley.com | *Daioleslam Seid Hassan* |
| pjensen@sidley.com | |
| tom.ross@sidley.com | |
| psampson@sidley.com | |

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, Appellee Daioleslam Seid Hassan ("defendant") certifies as follows:

**A.    Parties.**  The parties to this appeal are Appellants Trita Parsi and the National Iranian American Council ("NIAC") (collectively, "plaintiffs"), and Appellee Daioleslam Seid Hassan.  Parsi and NIAC were the plaintiffs in the underlying district court case, and Hassan was the sole defendant.

**B.    Rulings Under Review.**  Plaintiffs seek review of the following district court orders: (1) the district court's orders regarding NIAC's discovery violations entered on July 1, 2010, JA __-__, March 29, 2011, JA __-__, and August 30, 2011, JA __-__; (2) the district court's September 13, 2012 order and accompanying memorandum awarding attorney's fees and costs to defendant for discovery violations, JA __-__; (3) the district court's April 8, 2013 memorandum opinion and order awarding defendant $183,480.09 and post-judgment interest, JA __-__; and (4) the district court's judgment dated April 9, 2013, JA __-__.  The Honorable Judge John D. Bates issued all of the challenged rulings.

**C.    Related Cases.**  This case has not previously been before this Court, and counsel for defendant is not aware of any related cases pending in this Court or any other federal courts of appeals.

i

## **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ..................................................................iv

GLOSSARY .............................................................................. vii

INTRODUCTION ........................................................................1

STATEMENT OF ISSUES ................................................................2

STATEMENT OF FACTS ................................................................3

SUMMARY OF ARGUMENT ............................................................24

STANDARD OF REVIEW ..............................................................27

ARGUMENT ............................................................................29

I.      THE DISTRICT COURT ACTED WELL WITHIN ITS
        DISCRETION IN IMPOSING SANCTIONS AGAINST
        PLAINTIFFS ....................................................................29

        A.      The District Court Did Not Abuse Its Discretion Under Rule
                37(b) In Sanctioning Plaintiffs For Twice Violating A Court
                Order Compelling Them To Produce Their Server ...........................32

                1.      Violation Of The District Court's Orders ..................................32

                2.      Plaintiffs' Conduct Was Not "Substantially Justified".............36

                3.      The District Court's Powers Were Not Otherwise Limited .....39

        B.      Awarding Costs Relating To Redeposing Parsi And Blout For
                Having Wrongfully Withheld The Calendar And Membership
                Records Before Their First Depositions Was Not An Abuse Of
                Discretion ..........................................................................44

        C.      The District Court's Award For The Costs Of Subpoenas Of
                Third-Party Emails Wrongfully Withheld By NIAC Was
                Justified Under The Court's Inherent Authority, And, In Any
                Event, The Costs Are Recoverable Under Rule 54(d) ......................47

ii

D.    The District Court Did Not Abuse Its Discretion In Imposing
      Modest Sanctions For Parsi's False Interrogatory Answers And
      The Alteration Of Evidence ................................................................49

CONCLUSION ..................................................................................................55

CERTIFICATE OF COMPLIANCE ..................................................................57

CERTIFICATE OF SERVICE ...........................................................................59

APPENDIX

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bonds v. Dist. of Columbia*,
  93 F.3d 801 (D.C. Cir. 1996)...............................................................28

*\*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991)......................................................................28, 50

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*,
  602 F.2d 1062 (2d Cir. 1979) ...........................................................43

*Cunningham v. Hamilton Cnty.*,
  527 U.S. 198 (1999).........................................................................30

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
  702 F.2d 770 (9th Cir. 1983) ............................................................41

*Hamilton v. Ford Motor Co.*,
  636 F.2d 745 (D.C. Cir. 1980).........................................................41

*Hull v. Eaton Corp.*,
  825 F.2d 448 (D.C. Cir. 1987).....................................................27, 43

*Kapche v. Holder*,
  677 F.3d 454 (D.C. Cir. 2012).........................................................28

*LaPrade v. Kidder Peabody & Co.*,
  146 F.3d 899 (D.C. Cir. 1998)..............................................46, 48, 51

*LaShawn A. v. Barry*,
  87 F.3d 1389 (D.C. Cir. 1996)........................................................40

*Manion v. Am. Airlines, Inc.*,
  395 F.3d 428 (D.C. Cir. 2004).........................................................54

*Mulvaney v. Rivair Flying Serv., Inc. (In re Sanction of Baker)*,
  744 F.2d 1438 (10th Cir. 1984) .............................................53, 54, 55

\* Denotes authorities most relied upon

iv

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
  427 U.S. 639 (1976)..................................................................28

*Ranger Transp., Inc. v. Wal-Mart Stores, Inc.*,
  903 F.2d 1185 (8th Cir. 1990) ................................................42

*Roadway Express, Inc. v. Piper*,
  447 U.S. 752 (1980)..................................................................41

*Salahuddin v. Harris*,
  782 F.2d 1127 (2d Cir. 1986) ................................................42

*\*Shepherd v. Am. Broad. Cos.*,
  62 F.3d 1469 (D.C. Cir. 1995)..............................28, 29, 31, 51

*United States v. Johnson*,
  802 F.2d 1459 (D.C. Cir. 1986)..............................................37

*Update Art, Inc. v. Modiin Publ'g, Ltd.*,
  843 F.2d 67 (2d Cir. 1988) ....................................................43

*Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*,
  810 F.2d 243 (D.C. Cir. 1987)................................................40

**STATUTES**

2 U.S.C. §1601 ........................................................................8

22 U.S.C. § 611 ........................................................................9

**RULES**

Fed. R. Civ. P. 16(f) ..............................................................53

*Fed. R. Civ. P. 37 ............................................29, 30, 39, 42

Fed. R. Civ. P. 54(d)(1)..........................................................49

\* Denotes authorities most relied upon

**SCHOLARLY AUTHORITY**

*Federal Discovery Rules: Effects of the 1970 Amendments*, 8 Colum. J.L. & Soc. Probs. 623 (1972)......................................................................................30

**OTHER AUTHORITIES**

IRS, *Lobbying* (Apr. 18, 2013), http://www.irs.gov/Charities-&-Non-Profits/Lobbying ....................................................................................8

Office of the Clerk, U.S. House of Representatives, *Lobbying Disclosure Act Guidance* (Feb. 15, 2013), http://lobbyingdisclosure.house.gov/amended_lda_guide.html .......................................................................................8

*Oxford English Dictionary Online* (2013), http://www.oed.com/ ..........................35

* Denotes authorities most relied upon

## <u>GLOSSARY</u>

NIAC                   National Iranian American Counsel

IIC                    Iranians for International Cooperation

LDA                    Lobbying Disclosure Act

FARA                   Foreign Agents Registration Act

PwC                    PricewaterhouseCoopers LLP

## INTRODUCTION

Plaintiffs-Appellants the National Iranian American Counsel ("NIAC") and Trita Parsi (collectively, "plaintiffs") brought a defamation suit in April 2008 against Defendant-Appellee Hassan Daioleslam ("defendant"), an amateur investigative journalist living in Arizona, alleging that defendant defamed them by publicly stating that they were lobbying for the Islamic Republic of Iran. After lengthy discovery, which was unnecessarily protracted because of plaintiffs' repeated abuses of the process, defendant won a motion for summary judgment in 2012. Concurrent to his motion for summary judgment, defendant also moved the district court to impose sanctions for discovery abuses for eight categories of misconduct. The district court found that plaintiffs were guilty of discovery abuses in seven of those eight categories and awarded sanctions and costs to defendant totaling $183,480. The court did not sanction the defendant in any respect.

The awards resulted from plaintiffs' repeated discovery violations, including numerous false statements to the district court, false discovery answers, refusal to produce discoverable documents until repeatedly ordered by the court, and even disobedience of court orders. Plaintiffs' inappropriate behavior prolonged the proceedings unnecessarily and showed contempt for the decorum expected of federal court litigants.

Plaintiffs have chosen not to appeal the district court's summary judgment decision or any of the underlying merits of the case, and do not appeal important components of the sanctions arising from some of their most egregious abuses. Instead, they appeal only four of the seven categories of sanctions imposed by the district court. Those challenges rest on mistaken characterizations of the orders plaintiffs violated, the facts leading to the district court's entirely reasonable conclusions, and the nature of the inherent judicial authority and powers provided by Federal Rule of Civil Procedure 37. The seven instances in which the court did sanction plaintiffs were proper exercises of that authority and well within the court's discretion. In all respects, the sanctions imposed by the district court should be affirmed.

## STATEMENT OF ISSUES

Whether the district court abused its discretion in sanctioning plaintiffs for repeatedly failing to produce discoverable evidence and disobeying court orders, as well as providing false interrogatory answers and false statements to the court.

In particular:

1. Whether the district court abused its discretion under Rule 37(b) for sanctioning plaintiffs for twice violating a court order compelling them to produce their server.

2

2.  Whether the district court abused its discretion in awarding costs related to the redepositions of Parsi and NIAC legislative director Emily Blout for having wrongfully withheld calendar and membership records before their first depositions.

3.  Whether the district court abused its discretion in awarding costs under its inherent authority for the subpoenas of various third parties because plaintiffs wrongfully withheld emails or, alternatively, whether those costs are recoverable under Rule 54(d).

4.  Whether the district court abused its discretion in imposing sanctions for Parsi's false interrogatory answers and the alteration of evidence.

## STATEMENT OF FACTS

*The Parties.*  In 2001, defendant Hassan Daioleslam, a refugee of the Islamic Republic of Iran living in France, emigrated to the United States with his wife, who was awarded a post-doctoral grant at Arizona State University in cellular and molecular biology, and their young daughter.  An engineer by training, defendant took various jobs in the construction industry while continuing his interest in writing on Iranian politics and Iranian-American relations.

In 1997, plaintiff-appellant Trita Parsi, an Iranian citizen living in Sweden, organized Iranians for International Cooperation ("IIC"), which Parsi described as "the first lobby group in the US to support the normalization of ties between Iran

and the US." [#144, Ex. A.] Approximately 80 members of Congress were contacted by, in Parsi's words, this "small but active Iranian lobby group." [#144, Ex. T.] Parsi said that the organization sought "to protect Iranian interests."[1] [#130, Exs. H, I.]

As early as 2000, informed observers began concluding that Parsi and IIC sought to influence policies that would benefit the Iranian regime. In October 2000, Middle East expert Kenneth Timmerman wrote that Parsi and IIC were "lobbying the expatriate community on behalf of Iranian President [Mohammad] Khatami and lobbying the U.S. government to lift [international] sanctions" against Iran. [#144, Ex. L.]

In 2002, Parsi, along with several others, founded NIAC, another plaintiff-appellant. Parsi was named president, a role he still holds today. Over the next seven years, NIAC employees and members had hundreds of meetings and communications with members of Congress and their staff regarding legislation and resolutions involving Iranian interests [#130, pp. 6-8], often succeeding in convincing Congress to adopt NIAC's policy objectives. [*See, e.g.*, #130, Ex. Q

---

[1] In 1999, Parsi presented a paper in Cyprus with Siamak Namazi, a member of Atieh Bahar, a well-connected Tehran consulting firm, arguing for the establishment of another lobby group utilizing Iranian Americans to counter lobby groups such as the American Israel Public Affairs Committee ("AIPAC"). [#63, Ex. 16, p. 11.]

(NIAC press release stating that NIAC "successfully defeated a Congressional resolution"); #130 Ex. P.]

During the time of NIAC's lobbying efforts, Parsi was in direct contact via email, phone, and in-person meetings with Iran's Ambassador to the United Nations, Javad Zarif (who currently is Iran's foreign minister). [#144, pp. 6-8.] Parsi frequently transmitted proposals to U.S. government officials from Zarif, and he regularly reported information to Zarif. [#144.][2] In addition to Zarif, Parsi had frequent contact with other Iranian officials. [#144, pp. 6-8; #144, Exs. TTT, BB, CC; #130.] In his recent book, *A Single Role of the Dice*, Parsi cited 235 in-person meetings with Iranian officials. [#145, Ex. A, p. 27, n.11.] (Even so, Parsi never produced a single document in response to valid discovery requests regarding those meetings.)

As with Parsi's earlier efforts with IIC, NIAC was soon linked to the Iranian regime. At least two Iranian government newspapers, for example, described NIAC as the "Iranian Lobby in America." [#144, Exs. PP, K.] And, in July 2008, a member of the British House of Lords wrote members of Congress that NIAC and its members were "known lobbyists" for the Iranian regime. [#144, Exs. N, RR.] Baquer Namazi, the head of an Iranian government entity charged with

---

[2] On one occasion, Zarif told Parsi, "Your help is always welcome." [#144, Ex. G.] In one email exchange, Parsi exclaimed: "Zende bad Iran (English translation: "Long Live Iran!"). [#130, Ex. AA.]

overseeing NGOs in Iran, wrote to Parsi, "Thank you for your efforts, all designed to serve our dear country."  [#130, Ex. BB.]

In 2007, defendant wrote several articles about NIAC and Parsi, essentially concluding (as have others) that they were lobbying for Iran.  [#1.]  After defendant's first article was published, the official Iranian press branded him a "neoconservative" who was "[a]ttack[ing] . . . the Iranian lobby in America." [#144, Ex. K.]

***Plaintiffs' Defamation Suit Against Defendant.***  In April 2008, NIAC and Parsi filed this defamation lawsuit against defendant [#1], which, according to the minutes of a NIAC board meeting, was brought to silence him.  [2/22/2008 Board Minutes, Ex. 10 to Morse Deposition; #92 Ex. B.]   Defendant filed a motion to dismiss in July 2008 [#5], which the district court denied in February 2009 [#12]. He then obtained present counsel on a *pro bono* basis.  After more than three years of what the district court described as "contentious discovery" [#189 p. 2], defendant filed a motion for summary judgment, which the district court granted on September 13, 2012.  [#189, 191.]  The court held that plaintiffs "failed to define the universe of allegedly defamatory statements," that many of their complaints could "be dismissed easily," and that "the record suggests that defendant and his editors were careful to substantiate his articles and that defendant engaged with those who questioned him."  [#189 p. 14.]  After a careful

6

analysis of all of plaintiffs' arguments, the court granted defendant's motion for summary judgment, ultimately concluding that "plaintiffs have mustered no evidence that defendant actually harbored any doubts about the correctness of his writings, or willfully blinded himself to the truth, [so] their defamation claim must fail."  [#189 p. 22.]  Plaintiffs do not appeal the district court's grant of summary judgment.

   ***Plaintiffs' Discovery Violations and the District Court's Award of Sanctions.***  On the same day the district court granted summary judgment to defendant, it granted in part an omnibus motion he filed for sanctions ("Sanctions Opinion").  [#190.]  As detailed in the Sanctions Opinion, "[t]here is no question that plaintiffs have repeatedly tried to evade their discovery obligations."  [#190 p. 24.][3]

---

[3] In total, the court was called upon at least a half dozen times to decide motions to compel against the plaintiffs.  [## 27, 31, 32, 68, 78, 87, 93, 95,101,112, 113, 119, 120, 134, 135, 136, 137, 138, 156, 166, 168, & 188.]  In most of those instances, the court exercised its discretion not to impose sanctions even though, as in the case of Parsi's failure to produce his Swedish bank account records, the court found plaintiffs' argument "ridiculous."  [#157 (8/30/2011 Tr.) pp. 12-18.]  For instance, the court granted defendant's motion to compel production of the emails of Mohammad Mansouri but did not award fees as a sanction.  [3/5/2010 Minute Order.]  Nor did the court award costs for the first two motions to compel the Talebi emails, the first motion to compel the membership records, or the first two motions to compel the server for imaging.  [## 32, 68, 78, 93.]

Soon after discovery commenced in 2009, defendant served a document request seeking "[a]ll documents referring to NIAC's activities as lobbying, exercising political influence, taking positions on United States policies, or persuading United States political officials." [#159, Ex. A-3, Req. No. 14.] "Documents" were defined to include emails, calendars, and databases.

Defendant's document request touched on several sensitive issues for plaintiffs. First, as a tax-exempt organization under § 501(c)(3), NIAC was not permitted to commit a substantial part of its activities to lobbying, except under certain very limited circumstances. *See* IRS, *Lobbying* (Apr. 18, 2013), http://www.irs.gov/Charities-&-Non-Profits/Lobbying (providing that "no organization may qualify for section 501(c)(3) status if a substantial part of its activities is attempting to influence legislation (commonly known as *lobbying*)") (emphasis in original). And, Parsi and NIAC had filed tax returns under oath claiming that NIAC had engaged in no lobbying or grass roots advocacy. [#119, p. 8 & Ex. G; #130, Ex. T; #130, pp. 12-13.] Second, NIAC was not registered under the Lobbying Disclosure Act ("LDA"), 2 U.S.C. § 1601. The *Lobbying Disclosure Act Guidance* provides that "lobbyists," defined in part as individuals "whose lobbying activities constitute 20 percent or more of [their] services' time on behalf of [a] client during any three-month period," must register under the LDA. *See* Office of the Clerk, U.S. House of Representatives, *Lobbying Disclosure Act*

8

*Guidance* (Feb. 15, 2013),

http://lobbyingdisclosure.house.gov/amended_lda_guide.html.  In an internal

NIAC memorandum to NIAC legislative director Emily Blout, NIAC assistant

legislative director Patrick Disney admitted that it was "hard to believe [that]

Emily and I devote less than 20% of our time to lobbying activity."  [#119, p. 2 &

Ex. C.]  In addition, Parsi was not registered under the Foreign Agent Registration

Act ("FARA"), a disclosure statute that requires persons acting as agents of foreign

principals in a political or quasi-political capacity to make periodic disclosure of

their relationship with the foreign principal.  22 U.S.C. § 611.

Rather than comply with their discovery obligations under the Federal Rules

of Civil Procedure, plaintiffs surreptitiously withheld responsive documents,

falsely denied that certain responsive documents existed, made false and

misleading statements to the district court and to opposing counsel, disobeyed the

district court's discovery orders, and altered or failed to preserve evidence.  [*See*

#145, Ex. A.; *infra* pp. 9-21.]  A number of the court's orders to compel either

imposed sanctions or invited later requests for costs, so on September 16, 2011,

defendant filed an omnibus motion for sanctions [#145, Ex. A] simultaneous with

his motion for summary judgment on the merits [#144].

The district court imposed sanctions for the following discovery misconduct:

9

(1) *Failure to produce server for imaging until ordered three times to do so.*

Defendant learned in late 2009 that NIAC employees tracked their appointments

on Outlook calendars, although plaintiffs had previously denied this fact.  [#76 p.

5.]  On December 9, 2009, defendant requested the production of all NIAC

employees' Outlook calendar entries.  [#69 Ex. A.]  On December 29, 2009,

plaintiffs responded by producing 412 calendar entries, 80 of which were for

holidays including Groundhog Day and Flag Day.  [#76 pp. 5-6.]  The metadata for

78 of the entries indicated that they had last been altered December 25 through 27,

2009, shortly before being produced and months after the calendared events

themselves.  [#76 p. 5.]

Suspecting that discoverable calendar entries were being withheld or altered,

defendant requested NIAC's file server for forensic imaging.  Defendant's

knowledge that such a server existed was based upon numerous corroborating

sources of evidence.  He knew from plaintiffs' own e-discovery witness and their

counsel that NIAC had a server that contained NIAC's  Outlook email and

calendar files.  [#112 Ex. A; #52 Ex. D, p. 4.]  Additionally, NIAC cofounder

Babak Talebi testified that NIAC had a "server" [#143 Ex. LL p. 163], NIAC's

computer repair vendor attested that he replaced the "server" in early 2010 with a

new "server" [Op. Br. at 27; #112 Ex. E; #87 Ex. E.], plaintiffs' litigation

consultant referred to a "server" [#131 Ex. B p. 7], and NIAC CEO Kevin Cowl

had double-deleted a calendar entry for December 3, 2009, entitled "Finish-up Server and Backup" [#159 Ex. H pp. 15-16].

On July 1, 2010, the district court ordered plaintiffs to produce NIAC's server housing its calendar files for forensic imaging by PricewaterhouseCoopers ("PwC"): "NIAC shall, by not later than July 16, 2010 submit the server on which its Outlook calendars are kept to forensic electronic discovery experts at PricewaterhouseCoopers for forensic imaging." [#68.] On the date appointed for production of the server, however, plaintiffs—for the very first time—claimed that they had no server. This was despite the fact that, from defendant's first request for a forensic image of the server until the court's July 1, 2010 order compelling plaintiffs to produce it, and even in their July 15, 2010 motion for reconsideration, plaintiffs never once explained to the court that they had no "server." To the contrary, on June 3, 2010, plaintiffs reported to the court that NIAC had a "server" and that emails (*i.e.*, Outlook *.pst files) were on it. [#80 at 13.]

Instead of producing the server, plaintiffs produced eight personal computers, claiming that the universe of responsive calendar files could be found on those machines. [#86 p. 9; #112 p. 2.] Parsi's laptop computer was not among the eight machines because, plaintiffs claimed, it had been stolen two months earlier in Norway and had never been backed up. [#112 p. 2; #145 Ex. A, pp. 24-26.] Instead, plaintiffs produced a desktop computer which Parsi swore under oath

11

he had been using.  [#145 Ex. A, pp. 25-26.]  However, later forensic imaging would conclusively prove  that Parsi had stopped using the desktop machine for emails and calendaring several months earlier.  *See infra* pp. 20-21.

At a September 16, 2010 status conference, plaintiffs' counsel repeatedly denied the existence of a server[4] and claimed that the eight computers served as an adequate substitute.  [*See* #81 pp. 6-8; #112, p. 2.]  When defendant later determined that plaintiffs had failed to produce an additional four computers, which plaintiffs withheld as merely "intern" computers [#112 Exs. C, F], the district court on March 29, 2011, again ordered NIAC to produce the "server (or 'shared drive')" "containing NIAC's Outlook calendar entries that this Court ordered be produced in July 2010 for forensic imaging."  [#93 p. 3.]  Alternatively, the court allowed that, "[i]f no such server or 'shared drive' is produced" by the appointed date, "plaintiffs shall instead produce . . . the four . . . individual computers . . . that plaintiffs previously failed to produce."  [#93 p. 3.]

---

[4] This was also inconsistent with the fact that plaintiffs had managed to locate and produce dozens of emails going back several years for their employee, Mohammed Mansouri, from the offsite server of their internet service provider.  To this day, plaintiffs have not explained how they were able to retrieve hundreds (and produce dozens) of Mansouri's emails from the email server of NIAC's internet service provider for Mansouri but not for a single other NIAC employee.  [#137 Ex. D; #52, pp. 4-5; #63, Ex. 2.]  This directly contradicts NIAC's claim on appeal that NIAC "does not have an email server," Op. Br. at 12, and their statement to the district court that they had "no offsite data archives."  [#132, p. 3.]

In response, plaintiffs instead produced a "new server" onto which, they claimed, files had been "migrated" from the old server. (Plaintiffs did not then produce the four additional "intern" computers contemplated as an alternative means of complying with the court's order.) [#143 p. 10.] This production was inadequate because deleted files had not been migrated from the old server to the new one and the migration itself would have altered metadata, thus defeating the purpose of forensic imaging. When defendant pressed plaintiffs on this issue, they represented that the original server "may not be operational." [#112 Ex. H.] Accordingly, defendant filed a third motion to compel production of the server on July 1, 2011. [#113.] Plaintiffs' response [#131] now reflected that they had failed to produce eleven additional devices (in addition to the four mentioned in the court's March 29, 2011 order). [#131 Ex. B; #145 Ex. A, pp. 10-11.]

On August 30, 2011, the district court issued a third order compelling plaintiffs to produce "*all* of the servers/shared-drives on which NIAC's Outlook calendar entries have been kept from 2007 to the present." [#138 p. 1 (emphasis in original).] At the hearing granting defendant's motion, the court expressed its "outrage[]" that plaintiffs had "fail[ed] . . . to comply with [its] orders and produce discovery." [#157 p. 4.] Finally, on September 7, 2011, plaintiffs produced the server and all of their remaining computers, just days before defendant's deadline for filing his motion for summary judgment. Forensic analysis of those machines

13

uncovered 72 *.pst files with calendars, 20 of which had not previously been produced, containing more than 500 calendar entries.  [#143, Ex. XX, p. 7.]  The forensic analysis also determined that one of the "intern" computers had been used from 2007 to 2008 by Babak Talebi, a NIAC co-founder, and that the computer contained more than 300 of his calendar entries that had not previously been produced.  [*Id*.]  One of the entries related to a briefing with an Iranian agent whom a member of the British House of Lords had warned was an agent of the Iranian government.  [#145 Ex. A pp. 8-9.]  In addition, it turned out that another of the so-called "intern" computers actually housed the shared-drive server that plaintiffs had at one time insisted did not exist and later claimed was nonoperational.  [#112 p. 4]. The server worked just fine.

The district court held that plaintiffs' belated production of their email server had violated its July 1, 2010 order and necessitated two additional rounds of forensic imaging, at great cost to defendant.  Accordingly, the court held that, due to their "discovery abuses," "plaintiffs must reimburse defendant for the costs of the last two rounds of imaging.  [#190 pp. 5-6.]  Plaintiffs challenge this portion of the sanctions award.  *See infra* pp. 32-44.

(2) *The emails of Babak Talebi.*  Defendant requested the emails of several NIAC employees, including those of NIAC cofounder Babak Talebi.  Initially, plaintiffs produced a small number of Talebi's emails.  They later discovered and

14

reviewed 8,000 additional Talebi emails, producing 2,500 of those emails and claiming that the remaining 5,500 emails did not include any of the parties' agreed-upon search terms and were otherwise nonresponsive. [#95, p. 2.] The district court conducted an *in camera* review of the 5,500 emails [#93] and quickly determined that "many were clearly responsive" [#190 p. 15], by "searching for obvious terms such as 'lobbying,' 'Hassan,' and 'Iranian government'" [#95 p. 3]. On April 5, 2011, the court ordered plaintiffs to turn over all 5,500 remaining emails. [#95, p. 3.]

In its Sanctions Opinion, the district court awarded defendant costs associated with obtaining the portion of the March 29, 2011 order related to the Talebi emails, under Rule 37(a) of the Federal Rules of Civil Procedure. [#190 p. 16.] The court also awarded defendant half of the expenses associated with Talebi's second deposition because the first deposition "was taken before defendant received Talebi's emails and hence was much less useful." [#190 pp. 16-17.] Plaintiffs do not challenge either of these portions of the sanctions award. *See infra* pp. 22-23.

(3) *Third-party emails.* Plaintiffs also failed to produce a number of emails between NIAC employees and six separate third parties, ultimately requiring the defendant to obtain the emails by means of subpoenas to the third parties. [#143 pp. 19-23.] With respect to five of the six third parties, the district court deemed

15

plaintiffs' failure to produce the emails "indefensible," noting that "plaintiffs made no coherent attempt to explain . . . why all of these emails would not have been produced." [#190 p. 18.] The court found it particularly "disturbing[]" that "plaintiffs apparently gathered emails for their experts that they failed to produce to defendant, which clearly shows that plaintiffs' statement at the motions hearing that '[t]here may be technical explanations' for the failure to produce these documents is untrue." [#190 p. 18.] "Given plaintiffs' inexplicable and unexplained behavior," the court deemed it "appropriate to require them to pay the cost of serving the subpoenas" on the five third parties and to pay "the costs of bringing this portion of the instant motion." [#190 p. 18.] Plaintiffs challenge this portion of the sanctions award. *See infra* pp. 47-49.

    (4) *Membership records and Parsi deposition.* Defendant noticed references to an "SF" database in some of the previously withheld calendar entries. When defendant mentioned this "SF" database in a July 2010 motion, plaintiffs responded that "NIAC has not employed any such software and is therefore unable to comment about this unfounded claim by defendant." [#77, p. 4, n.1.] On August 4, 2010, defense counsel wrote plaintiffs' counsel asking for any "'SF' software/records," to which plaintiffs' counsel responded that "NIAC is not aware of any 'SF' software." [#143 Ex. II.]

Eventually, defendant determined that "SF" referred to a "Salesforce" database, which was used to track meetings with members of Congress and NIAC membership data. During a September 16, 2010 hearing, defendant asked plaintiffs to produce the Salesforce database. Plaintiffs responded in court that, although they had used the database in the past, it was only for "'a very short period of time [that we] did experiment with'" the software. [#145 Ex. A, p. 23.] Plaintiffs' counsel later described the use of Salesforce as "'sporadic'" and discontinued, even claiming "'our client does not have access to that information as we understand it.'" [#145 Ex. A, p. 23.] Nonetheless, plaintiffs eventually worked with a Salesforce technical representative and, they represented, managed to download the information: "'It was approximately 196 entries. 190 entries. It was a very small number of entries because they did not use this tool very long.'" [#145 Ex. A, p. 23.]

Plaintiffs' statements regarding the limited use of the Salesforce database were inconsistent with the evidence. Multiple NIAC employees stated that NIAC relied extensively on Salesforce from 2006 to 2009 to track NIAC members and meetings with congressmen and their staffers. NIAC assistant legislative director Patrick Disney testified that "everyone" in the office used Salesforce and that NIAC had been using it since before he began working there in May 2008. [#143 Ex. KK.] NIAC co-founder Babak Talebi testified that NIAC used Salesforce

17

extensively from 2007 to 2008 to track meetings with members of Congress, phone calls, and member outreach.  [#143 Ex. LL.]  And Parsi himself testified that Salesforce had been in use even prior to 2006 and that the membership data was migrated to a new product, Convio, in early 2010.  [#143 Ex. MM.]

On February 15, 2011, when plaintiffs finally produced the "meeting notes" records from the Salesforce database, the database actually contained more than 171,000 entries over a seven year period, scarcely "sporadic" and a "small number" as they had represented to the court.  Further, on March 2, 2011, when they finally produced the actual membership information from Salesforce, the metadata showed that the files had been created in May 2010, nearly ten months earlier, which strongly suggested that, despite their claims to the contrary, plaintiffs had access to these in September 2010 when they were first requested. [#145 Ex. A, pp. 23-24.]  The district court also ordered plaintiffs to produce their entire, current membership data from the new Convio database on March 29, 2011. [#93 p. 4.]  As of July 2011, however, plaintiffs had produced only a list of 116 former members and 9,000 transactions, and they had not provided a list of current and/or expired members.  [#113.]  Defendant moved to compel production of the complete list of current members, and, on August 30, 2011, the district court granted the motion, including an award of costs.  [#138.]  The court stated that it was "outraged by the conduct with respect to [the membership lists] issue[] and the

18

failure by plaintiffs to comply with [court] orders and produce discovery."  [#157 p. 4.]  Plaintiffs finally produced the lists on September 6, 2011, again just days before the deadline for dispositive motions.  [#145 Ex. A, p. 24.]

The membership data contained in the Salesforce and Convio databases was crucial to testing plaintiffs' damages claims that membership had declined due to defendant's allegedly defamatory statements.  Because the member lists were withheld until September 6, 2011, after every deposition in this case, defendant requested that he be awarded the fees and expenses of all two and a half days of Parsi's depositions.  [#145 Ex. A, p. 39.]  The district court determined in its Sanctions Opinion that plaintiffs' failure to produce the relevant membership data "was undoubtedly serious," but it declined to award defendant the fees and expenses of all two and a half days of Parsi's depositions.  [#190 p. 19.]  Rather the court awarded defendant "half of his expenses" for only the last half-day of Parsi's deposition, and it awarded defendant the expenses of bringing this portion of his sanctions motion.  [#190 p. 19.]  Plaintiffs challenge this portion of the sanctions award.  *See infra* pp. 44-47.

(5) *Blout redeposition.*  As a result of plaintiffs' belated calendar and server production, *see supra* pp. 9-14, defendant had to redepose NIAC's former legislative director, Emily Blout.  [#145 Ex. A, pp. 26, 41.]  "Because plaintiffs' tardiness in producing any of the calendar entries made the second deposition

19

necessary," the district court determined that "it is appropriate for plaintiffs to pay some of the reasonable expenses of that deposition," amounting to "half of the expenses of the redeposition."  [#190 p. 20.]  Plaintiffs challenge this portion of the sanctions award.  *See infra* pp. 44-47.

(6) *Parsi's false interrogatory response regarding his NIAC desktop computer.*  In an interrogatory response in November 2010, Parsi attested that he had been using his current desktop computer at NIAC for "approximately 1.5 years."  [#143 Ex. R, p. 3.]  Plaintiffs' own IT consultants noted, however, that the desktop was not even connected to the network, making it unlikely that Parsi was actually using it.  [#87 Ex. E, p. 2.]  In addition, PwC's forensic analysis of the computer showed that Parsi stopped using Outlook's email and calendar functions on the desktop on June 5, 2010, and stopped using the desktop altogether on August 5, 2010, not the November 2010 date stated in his interrogatory response. [#143 Ex. XX, p. 9.]

As the district court noted in its Sanctions Opinion, "[p]laintiffs devoted little attention to this issue in their briefing or at the motions hearing," even though they "had more than sufficient opportunity to oppose the very clear claims in defendant's sanctions motion."  [#190 pp. 22-23.]  "Because it seems quite clear that Parsi's interrogatory responses misrepresented when he had used the desktop—and because Parsi has never managed to explain what computer he *was*

20

using during that time—some sanction is warranted." [#190 p. 23 (emphasis in original).] Accordingly, the court "award[ed] defendant his reasonable expenses for this portion of the discovery motion." [#190 p. 23.] Plaintiffs challenge this portion of the sanctions award. *See infra* pp. 49-55.

(7) *IIC documents.* In the course of discovery, plaintiffs produced two copies of a flyer for IIC, Parsi's pre-NIAC lobbying group. [#145 Ex. A, pp. 28-29.] One copy, which was last modified in 1999, described IIC as a "lobby" group. [#145 Ex. A, pp. 27-28.] The other copy, which had been modified in April 2009, seven years after IIC had ceased operations and only a month before the document was ultimately produced in this litigation, described IIC as an "advocacy" group. [#143 Ex. A., pp. 27-28.] The documents were otherwise identical. [#145 Ex. A, pp. 27-28.]

Although the district court declined to "find by clear and convincing evidence that plaintiffs intentionally altered th[e] file,"—which, as the court noted, "would be required to impose the sanction of dismissal"—it did "find by a preponderance of the evidence that plaintiffs intentionally altered the document." [#190 p. 24.] The court imposed as a sanction defendant's "expenses of bringing this portion of [his] sanctions motion." [#190 p. 24.] Plaintiffs challenge this portion of the sanctions award. *See infra* pp. 49-55.

21

\*    \*    \*    \*    \*

In short, plaintiffs' numerous discovery violations occupied hours of the court's limited time, as it was called upon to sift through thousands of pages of materials in order to determine the appropriate relief in each of the many instances—in total, at least a half dozen times—it was called upon to compel NIAC to produce discoverable documents. Most often, the court did not impose sanctions, even though it warned plaintiffs that their discovery violations could result in sanctions: "You need to be making representations that you have already checked with your client to make sure that they are accurate . . . . Otherwise, everybody's time is just going to be wasted." [#81 (9/16/2010 Tr.) pp. 10-11.] Similarly, the court "warn[ed] the parties that, if the Court is called upon to settle a discovery dispute that the parties' experienced counsel should be able to resolve on their own, it will, at the least, impose a sanction of attorneys' fees reasonably incurred on the party it deems responsible for necessitating the Court's involvement." [#78, p. 3.] Only plaintiffs were sanctioned as a result.

***The District Court's Ultimate Awards and Plaintiffs' Appeal.*** On April 8, 2013, the district court ruled on defendant's petition for fees and costs, awarding $183,480 of the $280,786 he requested. [#211, pp. 1-2.] Plaintiffs have appealed only part of the sanctions awarded and did not appeal the summary judgment decision. In particular, they do not challenge the following aspects of the district

22

court's sanctions award: (1) half the costs of re-deposing Babak Talebi [#211

p. 14]; (2) the costs of obtaining the third order to produce the 5,000 Talebi emails[5]

[#211 p. 14-15);  (3) the costs of obtaining the second order to produce tens of

thousands of member records[6] [#211 pp. 11-14; #194; #213]; or (4) the costs

awarded under Rule 54(d) to defendant as prevailing party [#211 pp. 17-18].  Thus,

while the court awarded $183,480 in fees and costs [#211 pp. 1-2], plaintiffs do not

challenge $54,769 of that award, leaving at most $128,711 subject to their

challenge on this appeal.  (Appendix I contains a chart listing the amount awarded

in each category and whether it was appealed.)

Plaintiffs' appeal does challenge the following aspects of the district court's

sanctions award: (1) a portion of the costs of the omnibus sanctions motion[7] [#211

pp. 2-6]; (2) the costs of the second and third rounds of imaging by PwC  [#211

pp. 5-11]; (3) the costs of the third motion to compel NIAC's server[8] [#211 pp. 11-

---

[5] The district court did not award costs for the first two motions to compel
the Talebi emails even though it could have, since defendant prevailed, under Rule
37(a).

[6] The court did not award costs for the first motion to compel the
membership records even though it could have done so under Rule 37(a).

[7] As plaintiffs are not challenging the sanctions imposed for the Talebi
emails and depositions or the membership records, a substantial portion of the
$25,242 awarded to defendant for the omnibus motion for sanctions is also not
being challenged.

[8] The court did not award costs for the first two motions to compel the
production of the server for imaging even though it could have under Rule 37(a).

14]; (4) the costs of the third-party subpoenas [#211 pp. 15-16]; (5) the costs of half of Parsi's third deposition [#211 pp. 16-17]; and (6) the costs of half of Blout's second deposition [*id.*]. However, as plaintiffs do not challenge the sanctions awards for three of the categories, and the third-party subpoenas would be recoverable under Rule 54(d) in any event, the actual amount of the $183,480 award subject to challenge is approximately $106,288. *See* Appendix I.

## SUMMARY OF ARGUMENT

This appeal concerns quite routine and amply supported awards of sanctions against plaintiffs that plainly engaged in a series of serious discovery abuses. Plaintiffs do not challenge the district court's order dismissing their complaint and do not challenge the court's award of sanctions for several of their most egregious abuses (those unchallenged components of the award comprise approximately $75,000 of the $183,480 total award). Their challenges to components of the sanctions award disregard or mischaracterize the contents of the orders enforced, omit crucial findings or context supporting the district court's actions, fail to address the district court's inherent authority and authority provided under Rule 37, present a meritless argument not raised below, and fail to address or satisfy the relevant abuse of discretion standard of review.

Plaintiffs have not demonstrated that the district court abused its discretion, and this Court should uphold the court's imposition of sanctions against them.

*First*, contrary to plaintiffs' central objection to a principal component of the sanctions award, plaintiffs repeatedly violated the district court's July 1, 2010 order compelling them to produce their server for forensic imaging. They initially disobeyed the order when, in the face of evidence to the contrary, they claimed that they did not have a server (a false claim they continue to espouse on appeal), and offered to produce instead eight computers that included a computer supposedly used by Parsi but that forensic analysis revealed he had not been using. When it became apparent that plaintiffs had failed to produce a number of NIAC computers, the court again ordered them to produce their server, an order with which they did not fully comply, but instead produced a "new" server that did not contain all the contents of the old one. Finally, the court compelled plaintiffs a third time to produce their server or, as a substitute, all NIAC computers. Plaintiffs finally complied with the initial July 1, 2010 order on September 7, 2011, by producing a computer that contained NIAC's shared-drive server. Under Rule 37(b) of the Federal Rules of Civil Procedure, the court was authorized to sanction plaintiffs for the costs "caused by the[ir] failure" to comply with the court order, and the district court accordingly did not abuse its discretion. Plaintiffs' argument that their conduct was "substantially justified" has been waived and, in any event, is without merit because they provide no justification for disobeying an order of

25

the court.  Contrary to plaintiffs' assertion, the district court's actions were entirely consistent with the "law of the case" doctrine.

*Second*, plaintiffs' prolonged disobedience of the July 1, 2010 order resulted in the need to redepose Emily Blout, given that defendant had been denied her calendar entries at the time of her first deposition.  The district court did not abuse its discretion in awarding the costs of that redeposition.  Nor did the court abuse its discretion in awarding the costs of Parsi's third and final deposition.  The need for his redeposition arose from plaintiffs' disobedience of a March 29, 2011 order compelling them to produce their membership records.  Without these records, the first two Parsi depositions were less productive, and the court accordingly sanctioned plaintiffs for the costs of the redeposition.  Because plaintiffs violated the court's orders, Rule 37(b) clearly supports the award of sanctions, and the court's inherent authority independently supports that award.

*Third*, the district court did not abuse its discretion under its inherent authority by awarding defendant the costs of subpoenaing multiple third parties to obtain emails between plaintiffs and the third parties.  The court described plaintiffs' failure to produce the emails as "indefensible," "disturbing[]," "inexplicable," and "unexplained."  In other words, plaintiffs acted in bad faith, and the court acted well within its authority in imposing sanctions.  (In any event,

26

the costs of the subpoenas are recoverable under Rule 54(d) of the Federal Rules of Civil Procedure.)

   ***Fourth***, the district court did not abuse its discretion in imposing sanctions for two very serious discovery misrepresentations by plaintiffs.  First, the court acted within its inherent authority when it accepted defendant's characterization, absent argument by plaintiffs to the contrary, that Parsi's false sworn statements regarding his desktop computer were attempts to hide discoverable information stored on some other computer.  The court held that Parsi's sworn statements "clear[ly]" "misrepresented when he had used the desktop."  The court accordingly acted within its inherent authority to sanction plaintiffs for acting in bad faith. And, even if the district court's imposition of sanctions for plaintiffs' alteration of an old IIC document to omit the word "lobbying" fall beyond the court's inherent authority, the award may be upheld under Rule 16(f) of the Federal Rules of Civil Procedure, which does not require a showing of bad faith by clear and convincing evidence.

### STANDARD OF REVIEW

   In its Sanctions Opinion, the district court relied on two bases for imposing sanctions: Rule 37 of the Federal Rules of Civil Procedure, and the court's inherent power.  [#190 pp. 1-2.]  "The determination of an appropriate discovery sanction" under Rule 37 "is left to the discretion of the trial court."  *Hull v. Eaton Corp.*, 825

F.2d 448, 452 (D.C. Cir. 1987) (per curiam).  In reviewing that "broad discretion," *Bonds v. Dist. of Columbia*, 93 F.3d 801, 807 (D.C. Cir. 1996), "[t]he question, of course, is not . . . whether the Court of Appeals[] would as an original matter have [imposed the sanction]; it is whether the District Court abused its discretion in so doing."  *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976) (per curiam).  Appellate courts accordingly "review district court rulings on discovery matters solely for abuse of discretion, reversing only if the party challenging the decision can show it was clearly unreasonable, arbitrary, or fanciful."  *Kapche v. Holder*, 677 F.3d 454, 468 (D.C. Cir. 2012) (internal quotation marks omitted).  In addition, appellate courts are to "accept the district court's factual findings unless they are clearly erroneous."  *Bonds*, 93 F.3d at 808.

As with Rule 37 sanctions, "a court's imposition of sanctions under its inherent power" is reviewed on appeal for "abuse of discretion."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991).  The evidentiary standard that controls a court's use of its inherent power depends on the nature of the sanction imposed. For sanctions that are "fundamentally penal"—*i.e.*, "dismissals and default judgments, as well as contempt orders, awards of attorneys' fees, and the imposition of fines—the district court must find clear and convincing evidence of the predicate misconduct."  *Shepard v. Am. Broad. Cos.*, 62 F.3d 1469, 1478 (D.C. Cir. 1995).  In contrast, for "fundamentally remedial" sanctions—*i.e.*, sanctions

that "do not preclude trial on the merits," like "adverse evidentiary determination[s]" or the "preclu[sion] [of] the admission of evidence"—"a district court may impose [such] issue-related sanctions whenever a preponderance of the evidence establishes that a party's misconduct has tainted the evidentiary resolution of the issue." *Id.*

## ARGUMENT

### I.     THE DISTRICT COURT ACTED WELL WITHIN ITS DISCRETION IN IMPOSING SANCTIONS AGAINST PLAINTIFFS

Rule 37 of the Federal Rules of Civil Procedure, as well as the district court's inherent power, readily supported the imposition of sanctions that NIAC challenges.

Two components of Rule 37 are at issue. First, Rule 37(a) allows a party to "move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1). If the court grants the motion "or if the disclosure or requested discovery is provided after the motion was filed," "the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." *Id.* 37(a)(5)(A). Rule 37(a) further provides, however, that "the court must not order this payment if . . . the opposing party's nondisclosure, response, or objection was substantially justified." *Id.* 37(a)(5)(A)(ii). Rule 37(a) is "designed to protect

courts and opposing parties from delaying or harassing tactics during the discovery process." *Cunningham v. Hamilton Cnty.*, 527 U.S. 198, 208 (1999).[9]

Separately, Rule 37(b) provides that "[i]f a party . . . fails to obey an order to provide or permit discovery, . . . the court where the action is pending may issue further just orders." Fed. R. Civ. P. 37(b)(2). Where a party disobeys a discovery order, "the court *must* order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure." *Id.* 37(b)(2)(C) (emphasis added). As with Rule 37(a), Rule 37(b) provides that the court must not order payment of attorney's fees and other expenses if "the failure [to comply with the court order] was substantially justified or other circumstances make an award of expenses unjust." *Id.*

Federal district courts also have powers inherent to the institution available to ensure proper functioning of the judiciary. "When rules alone do not provide

---

[9] Prior to the 1970 amendments, Rule 37 "required a court, after granting a motion to compel discovery but before imposing sanctions, to find the losing party to have acted without substantial justification. At that time, courts rarely exercised this authority to impose sanctions." *Cunningham*, 527 U.S. at 208 n.5. Although "the amended Rule retained the substantial justification requirement, the placement of the requirement was changed so that the Rule provided that the district court, upon granting the motion to compel, 'shall' impose the sanction unless it found that the losing party's conduct was 'substantially justified.'" *Id.* That change "signaled a shift in the presumption about the appropriateness of sanctions for discovery abuses." *Id.*; *see also Federal Discovery Rules: Effects of the 1970 Amendments*, 8 Colum. J.L. & Soc. Probs. 623, 642 (1972) ("The advisory Committee reversed the presumption in Rule 37(a)(4) in order to encourage the awarding of expenses and fees wherever applicable.").

courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap." *Shepherd*, 62 F.3d at 1474. "The inherent power encompasses the power to sanction attorney or party misconduct, and includes the power to enter a default judgment . . .[,] fines, awards of attorneys' fees and expenses, contempt citations, disqualifications or suspensions of counsel, and drawing adverse evidentiary inferences or precluding the admission of evidence." *Id.* at 1475. Courts "review a district court's use of its inherent power only for abuse of discretion," but that "review is not perfunctory." *Id.*

Plaintiffs challenge only four of the seven categories of the sanctions the district court imposed upon them: (1) plaintiffs' failure to produce their server and documents (amounting to $82,043 of the total award); (2) plaintiffs' failure to timely produce calendar and membership data, resulting in the need to redepose Parsi and Blout (amounting to $11,620 of the total award); (3) plaintiffs' failure to produce documents, which required defendant to obtain those documents by serving subpoenas on third parties (amounting to $9,803 of the total award); and (4) Parsi's false interrogatory answers and the alteration of evidence (approximately $6,300 of the total award).[10] *See* Summary of Costs/Sanctions

---

[10] Plaintiffs also contend that the district court erred in ordering post-judgment interest to begin accruing on September 13, 2012, the date the court granted defendant's motion for summary judgment, rather than on April 8, 2013,

31

Awarded, Appendix I.  As shown below, the district court appropriately exercised

authority granted to it under the Federal Rules of Civil Procedure and its inherent

power to sanction plaintiffs in each of these four categories.

A.     The District Court Did Not Abuse Its Discretion Under Rule 37(b) In Sanctioning Plaintiffs For Twice Violating A Court Order Compelling Them To Produce Their Server

Plaintiffs argue that, in ordering them to pay for the second and third rounds

of imaging by PwC, the district court did not respond to a violation of a court order

and accordingly lacked authority under Rule 37(b) to sanction them.  Op. Br. at 51-

53.  This is plainly incorrect.  Plaintiffs repeatedly flouted multiple court orders

commanding them to produce their server.  In addition, there is no merit to

plaintiffs' additional argument that their conduct was "substantially justified."

Finally, plaintiffs incorrectly assert that the district court's powers are constrained,

but those supposed limits find no support in case law.

1.     Violation Of The District Court's Orders

On July 1, 2010, the district court formally ordered NIAC to "submit the

server on which its Outlook calendars are kept to forensic electronic discovery

experts at PricewaterhouseCoopers for forensic imaging."  [#68 p. 4.]  The order

provided that defendant would be able to "seek to recover the costs of the forensic

---

the date the court entered final judgment.  Op. Br. at 67.  Given the low statutory
rate of interest of 0.17% per annum, this amounts to roughly $183.  Defendant will
not waste the Court's time in arguing the merits of the district court's decision on
this marginal point.

analysis from NIAC" if "the forensic analysis shows" (1) "that discoverable calendar entries were omitted from previous productions" or (2) "that inappropriate edits were made to such entries."  [#68 p. 5.]

In its Sanctions Opinion, the district court held that it was "not persuaded that plaintiffs intentionally edited calendar entries," and it accordingly concluded that "fee-shifting is not appropriate on [the second] basis."  [#190 p. 5.]  But, noting that it had "bec[o]me apparent . . . that plaintiffs had omitted relevant computers and a shared-drive server from the production" and that during its third round of forensic imaging PwC "discovered several hundred unproduced calendar entries" [#190 p. 4], the court held that some degree of fee shifting was warranted on the first basis provided in its July 1, 2010 order—namely, that forensic imaging turned up previously unproduced calendar entries.  The court determined that "the forensic analysis show[ed] that discoverable calendar entries were omitted from previous productions."  [#190 pp. 4-5.]  As a result, plaintiffs had failed to comply with the court's July 1, 2010 order, and the court thus held that "they should be responsible for the costs of that failure."  [#190 p. 5] (holding that "plaintiffs must reimburse defendant for the costs of the last two rounds of imaging").

On appeal, plaintiffs attack that conclusion on two grounds.  First, they misrepresent the district court's holding regarding their belated server production, stating that "the district court implied that any NIAC violations were *de minimis*,

33

and therefore did not justify imposing sanctions."  Op. Br. at 51.  But the court

never said that the violations were *de minimis*.  Quite the contrary: the court

concluded that "conducting three separate imaging sessions cost [defendant] far

more than conducting one larger imaging session," and that that cost was directly

caused by plaintiffs' defiance of court orders.  [#190 p. 5.]

Second, although the district court determined that plaintiffs violated the

July 1, 2010 order by failing "to produce every device on which relevant data

might be stored" [#190 p. 5], plaintiffs maintain that "the order's plain language"

did not require that, but rather directed production of the "server on which

[NIAC's] Outlook calendars are kept" [#68 p. 4].  Plaintiffs further claim that the

server is "non-existent" and that they accordingly could not have violated the July

1, 2010 order by failing to produce it.  Op. Br. at 24, 56-57.

The district court acted well within its discretion in construing its own order

and finding that plaintiffs' failure to produce violated that order.  First, at least six

NIAC employees, consultants, and lawyers admitted that NIAC had a "server."

*See supra* pp. 10-11.  In addition, it eventually turned out that one of the so-called

"intern" computers that plaintiffs assiduously sought to exclude from discovery

contained the actual shared-drive server and housed hundreds of previously

unproduced discoverable calendar entries.  *See supra* p. 14.[11]  Ample record

evidence thus supports the district court's conclusion, and plaintiffs hardly point to

clear error on this finding.

Moreover, the district court did not issue the July 1, 2010 order in a vacuum.

It did so after plaintiffs had wrongfully withheld all calendar entries (in violation of

Rule 37(a)), then produced just 412 calendar entries on December 29, 2009,

followed by a supposedly "complete and unedited" set of calendars in April 2010

that was missing some of the entries produced in December 2009 and omitted the

"date modified" field that they had produced for the first 412 entries.[12]  That gross

failure to produce the key items sought by defendant led the district court to order

NIAC in July 2010 to produce its server for forensic imaging to permit defendant

to recover all Outlook calendar entries.

---

[11] Plaintiffs attempt to draw a distinction between a "shared drive" and a
"server."  Not only is this false distinction belied by the statements of its own
employees, but their so-called "shared-drive" is the very definition of a "server."
*See Oxford English Dictionary Online* (2013), http://www.oed.com/ (defining
"server" as, "[i]n a network, any program which manages shared access to a
centralized resource or service; an (often dedicated) device on which such a
program is run").

[12] Plaintiffs misleadingly claim that they produced only 412 calendar entries
because defendant wanted only entries relating to meetings with government
officials.  Op. Br. at 9.  That position ignores not only the district court's
conclusion but also the literal terms of the original discovery request.

Nor was there any doubt that the district court repeatedly demanded that plaintiffs comply with the July 2010 order, or that the resulting sanctions arose from violations of that order. At the hearing granting defendant's third motion to compel production of the server, the court said that it was "outraged" that plaintiffs had "fail[ed] . . . to comply with [its] orders and produce discovery." [#157 p. 4.] Thus, plaintiffs' claim on appeal that "the district court later clarified NIAC's server's definition in its March 2011 order . . . illustrat[ed] that the earlier order was ambiguous," Op. Br. at 52, has no support in the record. Indeed, exasperated by plaintiffs' repeated and continuing violation of the July 1, 2010 order, the court in its third and final order of August 30, 2011, required plaintiffs to produce "*all* of the servers/shared-drives on which NIAC's Outlook calendar entries have been kept from 2007 to present." [#138 p. 1 (emphasis in original).] The court was not modifying its previous orders, but simply preventing plaintiffs from continuing to violate the July 1, 2010 order. As a result of all of this, plaintiffs' violation of the July 1, 2010 order was a proper basis for imposing sanctions under Rule 37(b).

2.      Plaintiffs' Conduct Was Not "Substantially Justified"

Plaintiffs also argue for the first time on appeal that they were "substantially justified in refusing to produce a non-existent central server for PwC imaging." Op. Br. at 56. This argument is both waived and, in any event, without merit.

36

In their opposition to defendant's omnibus motion for sanctions plaintiffs never argued that they had been substantially justified in disregarding the July 1, 2010 order [*see* #152], so that assertion is waived. *See United States v. Johnson*, 802 F.2d 1459, 1465 (D.C. Cir. 1986) (when a party waives legal objections by not articulating them below, an appellate court "will not reverse other than in extraordinary circumstances affect[ing] substantial rights and result[ing] in a miscarriage of justice" (internal quotation marks omitted; alterations in original)).

Even had plaintiffs not waived this argument, it is without merit. On appeal, plaintiffs do not claim that their refusal to produce the calendar entries in the first place was substantially justified. Nor could they make such a claim, given that they clearly did not produce all relevant calendar entries, rendering the district court's July 1, 2010 order necessary. [*See* #190 p. 4 (noting that in the third round of imaging "PwC discovered several hundred unproduced calendar entries").] Plaintiffs thus flatly misstate the facts and disregard the district court's conclusions when they say that defendant's "multiple rounds of forensic imaging confirmed" that allowing defendant to image their "shared drive would be redundant" of his already completed effort of imaging NIAC computers. Op. Br. at 61. If that really were the case, hundreds of hitherto unproduced calendar entries would not have been uncovered.

37

Nor do plaintiffs even argue that their *failure to comply* with the July 1, 2010 order was "substantially justified"—only that their *opposition* to defendant's three separate motions to compel the server was.  Thus, plaintiffs bizarrely contend that their opposition to the third order (an order with which they complied) was "substantially justified," *id.* at 62, and also that their opposition to the second motion to compel the server was substantially justified, *id.* at 60-61, even though the district court never actually awarded the costs of that motion to compel.  Those arguments, of course, have nothing to do with whether plaintiffs were substantially justified in *failing to comply* with the July 1, 2010 order at issue.

As for their supposed substantial justification for disobeying the July 1, 2010 order, plaintiffs provide no justification for disobeying the order.  Instead, they assert a variety of reasons for why they *opposed* defendant's motion to compel, including that they were afraid that defendant would leak discovery information to the media,[13] *id.* at 58, that NIAC was not required to produce calendar entries in native format,[14] *id.* at 59, and that defendant's concern over alteration of calendar

---

[13] Plaintiffs themselves published defendant's emails that were produced in discovery.  [#159 pp. 2-3.]  And plaintiffs cite no authority for the proposition that publication of discovery materials not subject to a protective order is ever a valid reason for disobeying a court's discovery order.

[14] This is a disingenuous argument given that plaintiffs insisted at the very same time that defendant was obligated to produce his emails in native format. [#61 Ex. C.]

38

entries was unwarranted because "Outlook is a non-static program," *id.* at 59-60.

Even if those were valid bases for opposing defendant's motion to compel they do

not constitute valid reasons for *disobeying* the order once issued by the district

court.  Rule 37(b) provides that a "court must order" a party disobeying a court

order "to pay the reasonable expenses, including attorney's fees, caused by the

failure, unless the failure" to abide the discovery order "was substantially

justified."  Fed. R. Civ. P. 37(b)(2)(C).  To interpret the rule as plaintiffs have

suggested would be to invite *de novo* review of the rationale for the order in the

first place.  Once an order is entered, the fact that the court rejected the party's

reasons for *opposing* the motion to compel discovery is not a substantial

justification for disobeying the order.

      3.    The District Court's Powers Were Not Otherwise Limited

Plaintiffs raise the law-of-the-case doctrine to argue that the district court

somehow limited its ability to impose sanctions for the server imaging when—in

its July 2010 order—the court "established two exclusive categories under which

Daioleslam could seek imaging expenses."[15]  Op. Br. at 52.

---

[15] Plaintiffs assert that the district court somehow prospectively limited the
universe of discovery violations that might give rise to sanctions when it pointed to
two bases that could support recovery of costs, and that those two bases were
"exclusive."  Op. Br. at 52.  But there is no language in the order suggesting
anything of the sort.  Rather, the relevant provision of the order merely states: "If
defendant believes that the forensic analysis shows that discoverable calendar
entries were omitted from previous productions, or that inappropriate edits were

That doctrine is wholly inapplicable here.  The law-of-the-case doctrine is simple: "[T]he *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*."  *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) (emphases in original).  Its purpose is "to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 250 (D.C. Cir. 1987) (internal quotation marks omitted).  The district court's findings and actions leading it to impose sanctions for plaintiffs' non-production were entirely consistent with its July 1, 2010 order, and the court did not revisit or revise any prior determination.  The court's third imaging order specifically contemplated that the costs of the additional imaging could be shifted to plaintiffs and even put them on notice of the risk of having to pay for subsequent imaging necessitated by their gambit to withhold the server in violation of the July 1, 2010 order.  [*See* #138 p. 2 ("If . . . defendant believes that forensic imaging shows that plaintiffs omitted discoverable calendar entries from previous productions . . .  defendant may seek to recover the costs of the PwC forensic imaging analysis from plaintiffs.").]  The question as to whether plaintiffs'

---

made to such entries, he may seek to recover the costs of the forensic analysis from NIAC."  [#68 ¶ 5.]  This hardly limited the district court's ability to impose sanctions for discovery violations outside of these two categories, and nothing in the order limited *defendant's* ability to move for sanctions on a basis other than the two suggested by the court.

repeated violation of the July 1, 2010 order to produce their server on which

calendar entries were stored was sanctionable conduct was decided for the first

time in the court's September 23, 2012 opinion and, as discussed above, was

consistent with and in no way precluded by the July 1, 2010 order.[16]

Finally, plaintiffs are mistaken in their attack on the district court's

conclusion that Rule 37 "simply allows a court to issue any 'just orders' necessary

to punish past discovery abuses or deter future abuses."  [#190, p. 2.]  *See*

*Hamilton v. Ford Motor Co.*, 636 F.2d 745, 747 & n.8 (D.C. Cir. 1980) (providing

that "[t]he principal purpose of Rule 37(b) is punitive, not compensatory," and

identifying "three general purposes" served by Rule 37(b), among them "to serve

as a general deterrent against other litigants in other cases"); *see also Falstaff*

*Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 783 (9th Cir. 1983) ("As with

contempt, Rule 37(b) sanctions may serve either remedial and compensatory

purposes or punitive and deterrent purposes.").   As the Supreme Court has

indicated,  "Rule 37 sanctions must be applied diligently both 'to *penalize* those

whose conduct may be deemed to warrant such a sanction, [and] to *deter* those

---

[16] The district court did not impose as a sanction the costs of obtaining the first order to produce the server, even though the court could have done so under Rule 37(a).  Nor did the court impose the costs of that imaging as a sanction. Rather, the sanction was imposed for the second and third rounds of imaging, which were only necessary because of plaintiffs' "belated production of the relevant computers and shared-drive servers."  [#190 p. 5.]

41

who might be tempted to such conduct in the absence of such a deterrent.'"
*Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763-64 (1980) (emphases added; alteration in original) (quoting *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976)).

Plaintiffs' argument to the contrary rests on a misrepresentation of two circuit court cases. Op. Br. at 50. Both of these cases addressed the specific question whether lower courts erred in applying Rule 37(d),[17] rather than Rule 37(b), in imposing sanctions where a witness either failed to appear for a deposition or appeared but refused to answer certain questions, and these cases do not support plaintiffs' argument that Rule 37 cannot be used to punish past or deter future abuses. Indeed, the very language quoted by plaintiffs from *Ranger Transportation, Inc. v. Wal-Mart Stores, Inc.*, 903 F.2d 1185, 1188 n.5 (8th Cir. 1990) (per curium), indicates that the court was referring to Rule 37(d): "We disagree with the district court's conclusion that Rule 37 authorizes a court to order monetary awards solely to punish or deter *a party who has failed to attend a deposition*." (emphasis added). Plaintiffs' quotation from *Salahuddin v. Harris*, 782 F.2d 1127, 1130-31 (2d Cir. 1986), is taken wholly out of context. When the

---

[17] Rule 37(d) provides that "[t]he court where the action is pending may, on motion, order sanctions if: (i) a party or a party's officer, director, or managing agent—or a person designated under Rule 30(b)(6) or 31(a)(4)—fails, after being served with proper notice, to appear for that person's deposition."

*Salahuddin* court stated that Rule 37's language that a court "'may make such orders . . . as are just'" should not be read expansively, it was addressing the specific question whether the district court erred in applying Rule 37(d) to impose sanctions on a party who physically appeared for his deposition but refused to testify.  Plaintiffs' misreading is confirmed by other Second Circuit decisions. *See Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988) (providing that Rule 37 sanctions (1) "are specific deterrents" that "seek to obtain compliance with the particular order issued," and (2) are also "intended to serve a general deterrent effect on the case at hand and on other litigation, provided that the party against whom they are imposed was in some sense at fault"); *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979) (discussing Rule 37(b) sanctions and providing that "courts are free to consider the general deterrent effect their orders may have on the instant case and on other litigation, provided that the party on whom they are imposed is, in some sense, at fault").

*     *     *     *     *

Accordingly, plaintiffs have not shown that the district court's award of sanctions based on NIAC's much belated production of computers and its shared-drive server was "clearly unreasonable, arbitrary, or fanciful," *Hull*, 825 F.2d at 452 (internal quotation marks omitted), that they were substantially justified in

43

disobeying the district court's July 1, 2010 order, or that any other reason bars the award of sanctions.  This Court should uphold the district court's award of $71,624 of the costs of the second and third rounds of imaging by PwC, as well as the portion of the $25,242 costs of the omnibus sanctions motion attributable to this issue.

> **B.**    **Awarding Costs Relating To Redeposing Parsi And Blout For Having Wrongfully Withheld The Calendar And Membership Records Before Their First Depositions Was Not An Abuse Of Discretion**

The court awarded defendant half the costs of re-deposing Blout and Parsi because plaintiffs failed to produce complete sets of discoverable calendar entries and membership lists stored in plaintiffs' Salesforce and Convio software until after initial depositions for Blout and Parsi had already been conducted.  [#190, p. 19 (an additional "half day" of deposition time "was later added to account for various documents that plaintiffs produced belatedly"); *id.* at 20 ("plaintiffs' tardiness in producing any of the calendar entries made the second [Blout] deposition necessary").]  The court further reduced the amount defendant requested in his bill of costs by another 33% for Parsi's redeposition (ultimately awarding $8,439) and 20% for Blout's (awarding $3,180).  [#211, pp. 16-17.]

Plaintiffs contest this award, arguing that Rule 37(b) did not support the award because the district court supposedly did not identify specific orders that they violated.  Plaintiffs also claim  that the court's inherent power did not support

the award with regard to the delayed calendar entries that led to the need to re-depose Blout, because the court never found that plaintiffs operated in bad faith. Op. Br. at 54-56.  Plaintiffs are wrong on both counts—the court's award of sanctions was justified under either Rule 37(b) or its inherent authority.

Rule 37(b) was a valid basis upon which to award defendant the costs of having to redepose Blout.  As already discussed, *see supra* Part I.A, the belated production of the calendar entries was a direct result of plaintiffs' failure to abide the district court's July 1, 2010 order.  That violation and the resulting "tardiness in producing any of the calendar entries," the district court held, "made [Blout's] second deposition necessary."  [#190 p. 20.]  Plaintiffs are simply wrong in asserting that "the district court did not attribute those expenses to NIAC's having violated an order."  Op. Br. at 56.

Rule 37(b) was also a valid basis for awarding the costs of redeposing Parsi. Plaintiffs were twice ordered to produce the tens of thousands of member records —on March 29, 2011[18] [#93 p. 4], and then again on August 30, 2011 [#138], after plaintiffs failed to fully comply with the first order—before they eventually released them.  *See supra* pp. 9-14.  Even that production was not until September 6, 2011 [#145 Ex. A, p. 25], long after Parsi's initial two days of depositions.  At the time the court granted defendant's second motion to compel on August 30,

---

[18] Plaintiffs fail to even mention this order in their brief.

45

2011, it expressed "outrage[]" at plaintiffs' "conduct with respect to [the membership lists] issue[] and the failure by plaintiffs to comply with [court] orders and produce discovery." [#157 p. 4.] There is simply no basis for plaintiffs to claim, *see* Op. Br. at 54, that they abided by the court's August 30, 2011 order and therefore should not be liable for the costs of Parsi's redeposition.

Additionally, the court's inherent power supported its award of the costs for redeposing both Blout and Parsi. Plaintiffs argue that the court did not make an express finding of "bad faith," but an express finding is unnecessary, and the court clearly acted on the basis of its view of plaintiffs' bad faith conduct. "The fact that the district court never explicitly said the words 'bad faith' or 'recklessness' does not demonstrate an abuse of discretion: 'these words are not talismans required for affirmance.' . . . [I]t would be an empty formalism to find an abuse of discretion simply because the district court failed to invoke the magic words 'bad faith' or 'recklessness' . . . ." *LaPrade v. Kidder Peabody & Co.*, 146 F.3d 899, 906 (D.C. Cir. 1998). The court found that plaintiffs did operate in bad faith in their untimely response to valid discovery requests for the calendar entries and the membership data—it was those delays that led to the need to redepose both Blout and Parsi.[19]

---

[19] When the court said that it did not find sufficient evidence to conclude that plaintiffs sought to delete the calendar entries in "bad faith," the court was clear that that particular holding was limited to whether plaintiffs *deleted* entries—not to plaintiffs' continual delays in producing responsive calendar entries and the membership records.

As described above, the court stated that it was "outraged" by plaintiffs' repeated failures to comply with the court's orders and produce discovery.  [#157 p. 4.] Plaintiffs' violations were so flagrant that they clearly reflected bad faith.

Because plaintiffs have demonstrated no valid basis for challenging the award of costs of redeposing Blout and Parsi, this Court should uphold the $8,439 award for Parsi' redeposition, and the $3,180 award for Blout's redeposition, as well as the costs of defendant's omnibus sanctions motion associated with these issues.

C.    The District Court's Award For The Costs Of Subpoenas Of Third-Party Emails Wrongfully Withheld By NIAC Was Justified Under The Court's Inherent Authority, And, In Any Event, The Costs Are Recoverable Under Rule 54(d)

Plaintiffs do not dispute that they wrongfully withheld hundreds of emails which necessitated defendant's having to subpoena more than a dozen third parties to obtain them.  They nonetheless contend that the district court abused its discretion in awarding sanctions (amounting to $9,802) for the costs of subpoenas to the third parties because the prerequisites for sanctions under Rule 37 were not present and that the court's award was not supported by its inherent authority because the court "did not find that NIAC engaged in bad faith or equivalent conduct."  Op. Br. at 54.

To the contrary, the court did find that plaintiffs engaged in bad faith.  The court characterized plaintiffs' failure to produce the emails as "indefensible,"

47

noting that "plaintiffs made no coherent attempt to explain either in their briefing or at the motions hearing why all of these emails would not have been produced." [#190 p. 18.]  The court found it particularly "disturbing[]" that "plaintiffs apparently gathered emails for their experts that they failed to produce to defendant," a circumstance that "clearly shows that plaintiffs' statement at the motions hearing that '[t]here may be technical explanations' for the failure to produce these documents is untrue."  [#190 p. 18.]  Given that "inexplicable and unexplained behavior," the court held that it was "appropriate to require [plaintiffs] to pay the cost of serving the subpoenas . . . and the costs of bringing this portion of the [sanctions] motion."  *Id.*  And, the court was fully aware that plaintiffs had sought to mislead the court by claiming that "technical issues" might account for the non-production, even after being confronted with the fact that, as the court found, plaintiffs had provided the emails to their own experts.

These observations constitute a finding of bad faith.  As stated above, "[t]he fact that the district court never explicitly said the words 'bad faith' . . . does not demonstrate an abuse of discretion . . . ."  *LaPrade*, 146 F.3d at 906.  The district court's characterization of plaintiffs' conduct could not have more clearly described actions undertaken in bad faith.[20]

---

[20] Plaintiffs admit that the court was "pique[d]" with their behavior.  Op. Br. at 53.  They do not explain how the court could be "piqued" in these circumstances while still believing that plaintiffs were acting in good faith.

In any event, Rule 54(d) of the Federal Rules of Civil Procedure provides that "costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1).  [*See* #194, p. 3.]  The modest award of $9,802 is recoverable under that provision.  This Court should uphold that award, as well as the portion of defendant's omnibus sanctions motion attributable to this issue.

D.    The District Court Did Not Abuse Its Discretion in Imposing Modest Sanctions for Parsi's False Interrogatory Answers  the Alteration of Evidence

Of the $25,242 awarded to defendant for the costs of his sanctions motion, roughly one-quarter of the sanctions award (or approximately $6,300) was attributed to the two very serious areas of discovery misconduct: (1) a false interrogatory answer that Parsi was using the desktop computer produced at the first imaging when in fact he was not[21] [#190, pp. 22-24]; and (2) plaintiffs' alteration of a 1999 document removing the word "lobby" just a month before it was produced.  The district court noted that, with respect to each alleged discovery abuse, plaintiffs failed to rebut defendant's claims with any innocuous explanations, leaving the court with no choice but to find that "Parsi's interrogatory responses misrepresented when he had used the desktop" [#190,

---

[21]  Parsi also attested that the 8,000 Talebi emails contained no search terms [#143, Ex. S], which the court found to be obviously false [#95].  Plaintiffs do not appeal the court's sanctions for the wrongful withholding of the Talebi emails.

p. 23] and that plaintiffs intentionally altered the 1999 document before producing it.

Parsi claimed in a sworn interrogatory that "he had been using his current desktop computer at NIAC for 'approximately 1.5 years'" [#190 p. 20]. Forensic analysis—conducted over plaintiffs' objections—revealed that Parsi had not been using the computer during the time period he attested he had. Noting that plaintiffs never provided an explanation for Parsi's false interrogatory responses "to oppose the very clear claims in defendant's sanctions motion," the district court deemed it "quite clear that Parsi's interrogatory responses misrepresented when he had used the desktop" computer, warranting at least "some sanction." [#190 p. 23.]

Plaintiffs argue on appeal that the district court made two legal errors in awarding sanctions for Parsi's false interrogatory response. First, they note that the Supreme Court held in *Chambers* that "a court may assess attorney's fees" under its inherent authority only when a party "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," *Chambers*, 501 U.S. at 45-46 (internal quotation marks omitted), and that the district court "did not make any findings" that Parsi had so comported himself in providing a false interrogatory response and producing a dummy computer which he falsely claimed was his, Op. Br. at 66. But that is clearly incorrect. Just as they failed to do in the district court, plaintiffs again fail to provide an explanation for the false interrogatory response. Faced

with no explanation for the behavior below, the district court explained that it had no choice but to accept defendant's allegation that Parsi was "trying to hide information that was stored on some unproduced computer."  [#190 p. 21; *see also id.* at 23 (noting that "plaintiffs have had more than sufficient opportunity to oppose the very clear claims in defendant's sanctions motion, and the Court cannot perpetually excuse their failure to do so").]   In the absence of any justifying or mitigating circumstances, plaintiffs' conduct clearly meets the relevant test. Without the benefit of any argument justifying the plainly wanton and vexatious conduct, this Court has no basis to conclude that the district court abused its discretion in awarding sanctions for plaintiffs' apparent (and still unexplained) attempt to hide discoverable information, which, unless otherwise justified, clearly indicates action made in bad faith, vexatiously, wantonly, and for oppressive reasons.  *See LaPrade*, 146 F.3d at 906.

Plaintiffs' second contention also fails.  Noting that this Court held in *Shepherd* that, before a district court may award the "penal" sanction of attorney's fees under its inherent power, it must find under a "clear and convincing evidence" standard that the party committed "the predicate misconduct," *Shepherd*, 62 F.3d at 1478, plaintiffs argue that "the district court did not discuss which standard it employed when making its findings regarding NIAC's interrogatory responses," Op. Br. at 66.  That argument breezes past the language employed by the district

court, which concluded that it is "quite *clear* that Parsi's interrogatory responses misrepresented when he had used the desktop." [#190 p. 23 (emphasis added).] In other words, the court found the evidence clear and convincing that Parsi had acted in bad faith—*i.e.*, a "misrepresentation" in this context necessarily implies bad faith.

Plaintiffs make a similar argument with regard to plaintiffs' alteration of the IIC document to remove the word "lobby," contending that the district court found "by a preponderance of the evidence"—not by "clear and convincing evidence"— "that plaintiffs intentionally altered the document." [#190 p. 24.] Based on that conclusion, the district court determined that "an award of expenses is appropriate to deter such behavior." [#190, p. 24.] Even if this Court accepts plaintiffs' argument that the district court's imposition of the costs of defendant's sanctions motion for plaintiffs' alteration of the IIC document cannot be justified under the court's inherent authority, the district court's award of sanctions for the altered document should be upheld under Rule 16(f), which does not require a finding of bad faith. Although the district court did not mention Rule 16(f) in its Sanctions Opinion, that rule also provides courts with broad authority to impose sanctions. That provision provides in part:

> Instead of or in addition to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses—including attorney's fees— incurred because of any noncompliance with this rule,

52

> unless the noncompliance was substantially justified or
> other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 16(f)(2). "While on the whole Rule 16 is concerned with the mechanics of pretrial scheduling and planning, its spirit, intent and purpose is clearly designed to be broadly remedial, allowing courts to actively manage the preparation of cases for trial." *Mulvaney v. Rivair Flying Serv., Inc. (In re Sanction of Baker)*, 744 F.2d 1438, 1440 (10th Cir. 1984) (en banc). The Rule "indicates the intent to give courts very broad discretion to use sanctions where necessary to insure not only that lawyers and parties refrain from contumacious behavior, . . . but that they fulfill their high duty to insure the expeditious and sound management of the preparation of cases for trial." *Id.*

To impose sanctions under Rule 16(f), a district court need not "make a finding that there was bad faith." *Id.* Rather, "[t]he intent is to impose the sanction where the fault lies." *Id.* Moreover, unlike Rule 37(b), "[i]t is not necessary that the party or the party's lawyer be in violation of a court order." *Id.* Rule 16(f) simply seeks "to insist that the court, the lawyers and the parties abandon habits which unreasonably delay and otherwise interfere with the expeditious management of trial preparation." *Id.* at 1441. Thus, even "pattern[s] of

negligence" that fall short of "contumaciousness" are sanctionable under Rule 16(f). *Id.*[22]

Given what the district court viewed as a "rather damning account of the metadata and plaintiffs' failure to rebut it" [#190 p. 24], the court clearly "intend[ed] to impose the sanction where the fault lies," *Mulvaney*, 744 F.2d at 1440—namely, with plaintiffs. In "look[ing] at the totality of the circumstances, including the specific case under review, the total management problems for courts, and access and cost problems for litigants," *id.*, this Court should uphold this aspect of the district court's decision and "insist that . . . lawyers and the

---

[22] Like Rule 37 sanctions, sanctions imposed under Rule 16 are reviewed for an abuse of discretion. *Mulvaney*, 744 F.2d at 1440. Importantly, "[t]he issue of discretion must not be viewed in isolation." *Id.* Rather, appellate courts are to "look at the totality of the circumstances, including the specific case under review, the total management problems for courts, and access and cost problems for litigants." *Id.* Plaintiffs correctly point out, Op. Br. at 48, that this Court typically will not affirm sanctions awards using alternative rationales that the district court did not employ. *See Manion v. Am. Airlines, Inc.*, 395 F.3d 428, 431-32 (D.C. Cir. 2004). That general rule would apply here "unless [this Court] can say as a matter of law that it would have been an abuse of discretion for the trial court to rule otherwise." *Id.* at 431 (internal quotation marks omitted) (quoting *Ashby v. McKenna*, 331 F.3d 1148, 1151 (10th Cir. 2003). That is the case here. Given that the district court found by a preponderance of the evidence "that plaintiffs intentionally altered the document" [#190 p. 24] to omit the word "lobbying" just weeks before they were required to produce it in litigation over whether defendant had defamed them by stating that they engaged in lobbying on behalf of Iranian interests, it would not have been an abuse of discretion to sanction them for that misconduct.

parties abandon habits which unreasonably delay and otherwise interfere with the expeditious management of trial preparation." *Id.* at 1441.

The modest award of approximately $6,300 for the costs of this portion of defendant's sanctions motion is eminently reasonable for such serious discovery misconduct and well within the district court's discretion.

## CONCLUSION

This Court should uphold the challenged portions of the district court's award of costs, which include: (1) defendant's omnibus sanctions motion ($25,242); (2) the second and third rounds of imaging by PwC ($71,624); (3) the third motion to compel NIAC's server ($10,419); (4) the third-party subpoenas ($9,803); (5) half of Parsi's third deposition ($8,439); and (6) half of Blout's second deposition ($3,180). Those awards, combined with the awards not challenged by plaintiffs ($54,769), total $183,480. That total award should be affirmed.

Respectfully submitted,

Dated:  October 15, 2013                    /s/ Peter G. Jensen

HL Rogers
Peter G. Jensen
Thomas E. Ross
Paul J. Sampson
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C.  20005
t. (202) 736-8000
f. (202) 736-8711
hrogers@sidley.com
pjensen@sidley.com
tom.ross@sidley.com
psampson@sidley.com

-and-

Timothy E. Kapshandy
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603
t. (312) 853-7000
f. (312) 853-7036
tkapshandy@sidley.com

*Counsel for Appellee
Daioleslam Seid Hassan*

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, that *Appellee's Brief* complies with the applicable type-volume limitations set forth in Rule 32(a)(7)(B).  Excluding the categories of words which Rule 32(a)(7)(B)(iii) specifically exempts from the type-volume limitations, *Appellee's Brief* contains 13,428 total words.  This Certificate of Compliance was prepared in reliance on the word-count function of Microsoft Word 2007, which was used to prepare *Appellee's Brief.*

Dated:  October 15, 2013                     /s/ Peter G. Jensen

HL Rogers
Peter G. Jensen
Thomas E. Ross
Paul J. Sampson
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C.  20005
t. (202) 736-8000
f. (202) 736-8711
hrogers@sidley.com
pjensen@sidley.com
tom.ross@sidley.com
psampson@sidley.com

-and-

57

Timothy E. Kapshandy
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603
t. (312) 853-7000
f. (312) 853-7036
tkapshandy@sidley.com

*Counsel for Appellee,*
*Daioleslam Seid Hassan*

## CERTIFICATE OF SERVICE

I hereby certify that, on October 15, 2013, I electronically filed *Appellee's Brief* with the Clerk of the United States Court of Appeals for the District of Columbia via the CM/ECF system.  I further certify that I served David A. Schlesinger, Esq., and Afshin Pishevar, Esq., counsel of record for the Appellants, via (i) the CM/ECF system and (ii) separately via email.

Dated:  October 15, 2013                          /s/ Peter G. Jensen

HL Rogers
Peter G. Jensen
Thomas E. Ross
Paul J. Sampson
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C.  20005
t. (202) 736-8000
f. (202) 736-8711
hrogers@sidley.com
pjensen@sidley.com
tom.ross@sidley.com
psampson@sidley.com

-and-

Timothy E. Kapshandy
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603
t. (312) 853-7000
f. (312) 853-7036
tkapshandy@sidley.com

*Counsel for Appellee,*
*Daioleslam Seid Hassan*

# **APPENDIX**

| SUMMARY OF $183,480 COSTS / SANCTIONS AWARDED | | | |
|---|---|---|---|
| **SANCTION** | **AWARD** | **REQUESTED** | **CHALLENGED / COMMENTS** |
| 50% of the Costs to Re-Depose Talebi | $6,721 | $7,599 | No |
| Costs of Third Order to Produce 5,000 Talebi Emails | $8,606 | $17,943 | No |
| Costs of Second Order to Produce Member Records | $10,419 | $12,514 | No* |
| Rule 54(d) Costs to Prevailing Party | $29,027 | $29,024 | No |
|  |  |  |  |
| **TOTAL UNCHALLENGED** | **$54,772** | **$67,080** |  |
|  |  |  |  |
| Costs of Third Motion to Compel Server | $10,419 | $12,514 | Yes* |
| Costs of 2nd and 3rd Imaging | $71,624 | $144,794 | Yes |
| Costs of 50% of Parsi's Third Deposition | $8,439 | $12,809 | Yes |
| Costs of 50% of Blout's Second Deposition | $3,181 | $3,755 | Yes |
| Costs of Third-Party Subpoenas | $9,803 | $9,802 | Yes (but recoverable under Rule 54(d)) |
| Costs of Omnibus Sanctions Motion | $25,242 | $33,467 | In part, but as plaintiffs are not challenging at least four of the awards, at least half of the cost of the Sanctions Motion is not being appealed ($12,621). |
|  |  |  |  |
| **TOTAL CHALLENGED** | **$128,708** | **$217,141** | **Reducing this by 50% for the unchallenged portion of the Sanctions Motion and counting the Subpoena costs as Rule 54(d) costs, only $106,288 is effectively being challenged.** |
|  |  |  |  |

*The Second Motion to Compel Member Records and Third Motion to Compel the Server were the subject of one order [#138] and treated together in the court's ruling on costs [#211, pp. 11-14], which awarded $20,838.00.  These are apportioned 50/50 in this summary.